VANEMBURG *v.* DUFFEY.

Opinion delivered June 18, 1928.

*Cole & Poindexter,* for appellant.

*S. M. Casey,* for appellee.

MEHAFFY, J.  This suit was brought by appellant to recover $2,375, being 5 per cent. of the sale price of lands which appellant claims as commissions for making the sale for appellees.

Appellant is a broker, engaged in procuring purchasers and selling real estate in Independence County and surrounding territory, with offices at Batesville, Arkansas, and has been so engaged for a number of years. The appellees were owners of a tract of land in Independence County, known as the Gainor farm, which they desired to sell. Appellant alleges that they employed him to make a sale of said land, and that he did make the sale to one Ben Desha for the price fixed by appellees. He alleges that he was acting under the orders and at the instance of the appellees, and that he sought and found a purchaser, and that appellees knew these facts. He alleges that, by reason of such employment and the result of which was accepted by the appellees, he is entitled to a fair and reasonable brokerage commission, and alleges that the customary commission is 5 per cent. on the sale price.

The appellees filed answer, denying all the material allegations of plaintiff's complaint, and, the regular judge being disqualified, Hon. T. D. Wynne of Fordyce was elected special judge to try the case, and, by agreement of parties, a jury was waived and the case was tried by the judge sitting as a jury.

The appellees knew appellant, and knew the business in which he was engaged. According to appellant's testimony, he had a conversation with one of the appellees, Gainor Duffey, something like a year before the sale of the land. He knew Duffey, and was familiar with the Gainor farm, the tract of land involved, and he testified that this conversation he had with Duffey was in the latter part of 1924 or the first part of 1925. That Duffey asked him if he had any one interested in river bottom farms, and he replied that he did. Duffey told appellant that he had a farm for sale, and fixed the price at $60,000. Appellant testifies that, immediately after that, he commenced talking to Mr. Desha, who was interested in it, and stated that it was worth $40,000. He testifies that he told Duffey this, and Duffey replied that he would not consider $40,000 at all.

Appellant then testifies that, on the 20th day of November, 1925 or 1926, he thinks it was 1925, he met Duffey on Main Street, in the morning about 9 o'clock, and told Duffey, if he would get down to brass tacks, he was in touch with a party to sell his farm to. Duffey asked him what he meant by brass tacks, and appellant told him they were going to build a bridge there, and that it would make his farm worth less, and the principal part of this conversation was about the depreciation in the value of the lands because of the building of the bridge. But appellant told him, according to his testimony, that he was in touch with a party that he believed would give $43,000, and Duffey told him he would not take it. Appellant then said he might be able to get $45,000, and Duffey said he did not think he would take $45,000. But he testifies that Duffey said he would take it up with Mrs. Fitzhugh, and that they would take it up with Mrs. Ponder, the sisters of Duffey, who were interested in the land. He also testifies that Duffey said for appellant to try to get in touch with his party and see how high he could pull them up, and he would see him in the morning. The next morning he was standing over there in front of the stairway in front of the building where appellant's office is, and Duffey came down the street, and asked appellant what he knew. Appellant told him he was pretty sure the parties that he was figuring with would give $45,000, and Duffey said he would not take it. He then told him he believed he could pull them up to $47,500, and Duffey replied that there had been a person figuring with him for twelve months, and that he thought it was the same fellow appellant had in mind, that it was Desha Lester. Appellant told him it was not Desha Lester, and Duffey then said if it was not Lester he would hold the man off from renting the place until 4 o'clock. Appellant then, according to his testimony, went up to the office, and was making preparations to go over to see Mr. Desha. That Mr. Desha soon came in town, and appellant took him up to his office and told him if he wanted to buy the farm now was the time

to buy it. That he could sell it to him for $47,500. . That Desha said he did not think he would go over $43,000, that $45,000 was a big price. Appellant told Desha that $47,500 might be a little high, but it joined Desha's other land, and he did not think he would let $2,500 stand in the way, and then Desha said to tell them he would accept the property. Desha agreed to meet witness and Duffey at one o'clock, and they met at Judge Bone's law office to have the contract written, and appellant testified that he said: ''I have sold Mr. Duffey's farm to Mr. Desha, and want you to write the contract for us,'' and that Desha said he was buying the farm for his nephew, Desha Lester.

The above is the substance of the testimony of appellant, and Ernest Morris, witness for him, corroborated him as to the conversation on the street in front of appellant's office, and Ben Desha also testified about the conversation that occurred in Judge Bone's office. The contract was written by Judge Bone, and the place was sold to Desha Lester for $47,500.

Appellees deny that they ever employed appellant to make the sale, and state that they had been negotiating with Desha Lester for more than a year, and that the place was sold to Desha Lester.

We think it would be useless to set out the testimony in detail. There was considerable conflict in the testimony of appellant's witnesses and the witnesses for appellees, and it was purely a question of fact as to whether there was a contract or not.

A contract with a broker to sell real estate is like any other contract. It may be express or implied, and may be either written or oral. But, whatever may be its form, it must appear that there was an offer and an acceptance. There must be an agreement of some kind. It would not be necessary, of course, that they agreed on the amount of the commission, but there must be an understanding that the appellant would undertake to sell the property for appellees and that appellees accepted

the services of the appellant with the understanding that the appellant would be paid for his services.

Appellant's first contention is that the contract need not be in writing, and in this contention appellant is correct. The statute of frauds has no application.

It is next stated by appellant that Duffey and Mrs. Fitzhugh knew that appellant was a real estate broker. The testimony is undisputed as to this proposition. They knew he was engaged in the real estate business as a broker.

It is next contended by appellant that Mrs. Fitzhugh knew that her brother was dealing with appellant in this matter and relies on the following testimony of Mrs. Fitzhugh to support this contention:

"Q. You knew your brother was negotiating this sale, did you not? A. He came in Friday, and told me Mr. Bee Vanemburg had stopped him in the street and wanted to know what the lowest price was."

Certainly the above did not indicate to her that her brother had employed Mr. Vanemburg, or that she was under any obligations to him for selling the place.

The next question raised by appellant is, Did appellee, Duffey, employ appellant to sell this land? We have already quoted the testimony of the appellant substantially, and there is some conflict in the testimony, although the testimony of the appellant himself on the question of any agreement is very meager, and does not show any agreement to pay for appellant's services; that neither party sought him, and that he was endeavoring to get the sellers to take less than they offered and endeavoring to get the purchaser to pay more than he offered, and that he finally got them together, according to his testimony.

Appellant calls attention to and quotes from a good many authorities on the question of the liability to pay a commission where a broker had been employed to sell property. There is no conflict in the authorities as to the liability for commissions where one has employed a broker to sell property. If one employs a broker to sell

property and he sells it, the broker is entitled to his commission. But the question here is whether the broker was employed to sell the property and whether there was ever any implied agreement to pay him a commission. The burden was on appellant to establish by a preponderance of the evidence that he had been employed.

The rule is stated in Mechem on Agency, as follows:

"To entitle the broker to commissions for his services, he must make it appear that the services were rendered under an employment and retainer by the principal, or that the latter accepted his agency and adopted his acts, under circumstances reasonably indicating that the principal knew the services had been rendered on his account and in reliance upon his obligation to pay for them. If the broker rendered the services as a mere volunteer, without any employment, expressed or implied, he cannot recover commissions, even though he brought the parties together and was the efficient means of procuring the consummation of the bargain." Mechem on Agency, 2426.

Corpus Juris states the rule as follows:

"To entitle a broker to compensation, he must have been employed to negotiate the transaction in connection with which his services were rendered. In the absence of such employment, or, in other words, where the broker acts as a mere volunteer, he is not entitled to compensation, although his services are the efficient cause of bringing the parties together and result in a sale or other contract between them." 9 C. J. 554.

"As it takes two to make a bargain, a broker is not entitled to be compensated for his services unless they were rendered pursuant to the express or implied request of his employer. To warrant a recovery upon his part, he must have been actually employed by the person he is seeking to hold liable, for otherwise there would be no legal basis for his claim to compensation, notwithstanding the fact that a purchaser may have been found through information furnished by him. The calling of a broker is not preferred, in the eye of the law, to that of other

occupations, and he is no more entitled to remuneration for services voluntarily rendered without any employment, express or implied, than any other member of the community. While a contract of employment may be implied from subsequent acts of ratification on the part of the alleged principal, to warrant the inference of a previous request, the owner must say or do something tending to prove that he accepted the broker as his agent in the matter—something more than merely selling to the party whom the broker, while acting as a volunteer, brought to him. Of course, the fact that a vendor accepts the benefits of a broker's efforts does not render him liable to the broker for commissions on the theory of ratification, where he did not know that the broker was working in his behalf, but, on the contrary, the circumstances of the broker's endeavors indicated that he was working in the interest of the purchaser. * * * Furthermore, it is practically universally held that the mere asking and receiving the price of property does not of itself make the broker the agent of the owner, entitling him to commissions, although he finds a purchaser, or the owner subsequently disposes of the property to one with whom the broker had negotiated." 4 R. C. L. 298.

In a recent and well considered case it was said:

"The broker, like other agents, derives his authority from the appointment of his principal, and, in order to obtain rights himself, or establish liability to others against his principal, or to incur liability to his principal, the fact of his appointment must be made to appear. * * * The principal cannot be bound by, or be made liable for, services rendered by a broker which are purely voluntary on the part of the latter, and performed without the express or implied consent of the principal; but, even in such cases, the principal may, by availing himself of the benefits of the services, not only ratify and confirm the acts done, but render himself liable to the broker for their value. * * * To entitle the broker to commission for his services, he must make it appear that the services were rendered under an

employment and retainer by the principal, or that the latter accepted his agency and adopted his acts, under circumstances reasonably indicating that the principal knew that the services had been rendered on his account and in reliance upon his obligation to pay for them." 49 A. L. R. 919.

In the same case the court also said: "But a contract of employment and an agreement to pay commissions will not be implied from the mere fact that the owner of property consents to the rendition of services by a broker which result in a sale of the property, especially where the owner had no knowledge that the broker was acting as such before the sale was consummated, or where he had previously refused to employ the broker."

Again, it was said in the same case: "A ratification of his act, where the original employment is wanting, may, in some circumstances, be equivalent to an original retainer, but only where there is a plain intent to ratify. An owner cannot be enticed into a liability for commissions against his will."

We think that the most that can be said in this case is that the owner of the property consented to the rendition of services, and that the parties really had no knowledge that the broker intended to charge them any commission. At least, it was a question of fact for the trial court to determine whether or not there was a contract with the understanding that appellees would pay a commission, or whether the circumstances were such as to justify the conclusion that a contract was in fact made.

The law is so well settled in this State that it is unnecessary to cite authorities or to review the authorities cited by parties at any length. It is the rule in this State that, if one employs a broker to sell real estate and nothing is said about the commission or the amount of it, then the broker, if he makes the sale, is entitled to the customary commissions. But it is also well settled by the decisions of this court that, before he is entitled to commissions for making a sale, there must have been a contract or an agreement, either express or implied, that he

was acting for the owner of the land, and expected pay for his services.

The testimony in this case, as we have already said, is conflicting, the appellees testifying that they never employed the appellant. And the testimony of the defendants contradicts that of the appellant in several particulars.

This court has said: "While the testimony of the plaintiff on this point was contradicted by that of the defendant, the finding of the circuit court in favor of the plaintiff is conclusive upon us upon appeal." *Courtney v. G. A. Linaker Co.*, 173 Ark. 777, 293 S. W. 723.

The finding of the trial court sitting as a jury, on questions of fact, is as conclusive here as the finding of a jury. And the rule is that, if there is any substantial evidence to support the findings of the trial court, its findings will not be disturbed.

In this case there was substantial evidence to support the finding of the trial court, and the judgment is therefore affirmed.