## C. E. BENNETT *v.* Dean WISDOM
### D/B/A Wisdom Realty

5-5245                                    453 S. W. 2d 396

### Opinion delivered May 11, 1970

*Pope, Pratt, Shamburger, Buffalo & Ross;* By: *Pat Moran,* for appellant.

*Givens, Capps & Murphree,* for appellee.

J. Fred Jones, Justice. Dean Wisdom, d/b/a Wisdom Realty, sued C. E. Bennett in the Pulaski County Circuit Court for a realtor's commission of ten per cent on the sale price of real property in the amount of $6,000. The trial court, sitting as a jury, rendered judgment for Wisdom against Bennett for $600 and Bennett has appealed. He relies on the following point for reversal:

"The court erred in finding that a Contract existed between the parties upon which a real estate commission could be based."

The only written instrument offered in evidence was an offer and acceptance form signed by Jimmy McClung as buyer and Dean Wisdom as agent, wherein McClung offered to buy "five acres C. E. Bennett property." Among other provisions of the offer, McClung agreed to pay $6,000 for the property with $300 in cash and the balance in 84 monthly payments of $87.43 each. McClung's offer was not accepted by Bennett and is only important here as some evidence of Wisdom's compliance with his verbal contract. This is not a suit for specific performance, but is one for a realtor's commission based on a verbal contract for the sale of real property.

The trial court concluded from highly conflicting evidence, that an enforceable verbal contract was entered into by Bennett and Wisdom whereby Bennett agreed to pay Wisdom a ten per cent commission on the sale price of five acres of Bennett's land if Wisdom would find a buyer who would pay $6,000. The trial court also found that Wisdom had performed his part of the contract by finding a purchaser for Bennett's property who was ready, able and willing to purchase the property for the price and on the terms laid down by Bennett, and that Wisdom had earned the commission that he and Bennett had agreed upon. See *Belyeu* v. *Hudson,* 179 Ark. 657, 17 S. W. 2d 865. On appeal from a law court decision, this court is bound by the substantial evidence rule which has been announced and reiterated in our decisions too numerous to mention. Under that rule we can only concern ourselves with whether there was any substantial evidence to support the judgment of the trial court in this case, and we conclude that there was.

The facts upon which the trial court rendered its judgment must be gleaned from the conflicting testimony, and it is in such situations as this, that the appearance and demeanor of the witness while testifying

becomes so important to a chancellor in an equity case, or to a jury, or a trial judge sitting as a jury, in a law case. In such cases, where a just and proper decision must rest on the truth in conflicting evidence, we have always recognized the importance of seeing and hearing the witnesses testify, as the trial judge and jury are permitted to do; as opposed to reading from the record what the witness said, as we are required to do on appeal.

Mr. Wisdom testified that he had been in the building contracting business and had known Mr. Bennett and done business with him for a number of years. He says that in November, 1968, Mr. McClung contacted him in regard to purchasing some real property on which to place some house trailers. He testified that he entered into a verbal contract with Bennett to sell five acres of Bennett's property to McClung. Mr. Wisdom says that he called Mr. Bennett concerning four acres which Mr. Bennett did have for sale and was advised by Bennett that the four acres had already been sold. He says that Bennett advised that he had another five acre tract he would sell. Wisdom testified that he made an appointment with Bennett to look at the five acre tract, and he continued his testimony as follows:

"I picked him up at his house and we drove over to the North end of this property which is a tract that appears to be about twenty acres. He showed me where the two North corners were, we walked along the North line of the property, he showed me where there was a one acre tract cut out of the Northeast corner of this twenty that belonged to the Pulaski County School Board. For this reason, this particular tract he was agreeing to sell would have. to be irregular in shape. We walked along the West line of the property and criss-crossed the property and back to the East side where our car was located. We sat in my car and we took a piece of scratch paper and determined how much additional footage we would have to give in order to make this a full five acre tract since there was one acre missing out of the Northeast corner. I asked what

price he wanted and he said Six Thousand Dollars.. I asked if he would be agreeable to paying a ten percent sales commission on the Six Thousand Dollars and he said yes.

* * *

We drove back to his house and I let him out. The following day, I called Mr. McClung and told him I had some property I would like to show him, took him out there, he and his wife . . . We walked over the property like Mr. Bennett and I had and discussed financing and what the monthly payments would be approximately. . . He said he needed a little time to think and talk about it. . . For the next three weeks, I kept in contact with Mr. McClung.

* * *

When Mr. McClung told me he was ready to make an offer, I said, 'Let me contact Mr. Bennett again and see if the property was still available.' This was on Saturday, the 16th of November. I called Mr. Bennett and I told him, I said, 'My people are ready to make an offer on this property, have you sold. it or is it still available?' He said, 'No, Dean' it's still available.' I said, 'Well, I'll get them together and make an offer and I'll be back in touch with you.' They came to my office on the Seventeenth and we drew an offer and I took some earnest money and that afternoon, I carried the offer to Mr. Bennett, presented it to him, we sat down in the front seat of my car and went over the offer. Mr. Bennett was agreeable to this offer. We again took a scratch pad and figured out how much extra footage he is going to have to give the man to get him a full five acres and Mr. Bennett had his pen in his hand and started to sign the offer and he said, 'Does my wife need to sign this? and I said, 'It won't be necessary for her to

sign this particular instrument, but she'll have to sign the sales contract.'

\* \* \*

Q. Did Mr. Bennett subsequently refuse to sell the property?

A. Yes, sir.

Q. Did you make . . . did you and Mr. Bennett have any discussion or conversation concerning your commission?

A. Yes, we did about the second or third day after this, I called Mr. Bennett and asked him to stop by, I would like to talk to him. This time we sat in his car and Mr. Bennett then agreed with me that this was what the property was worth and he would like to go ahead and sell it but his wife didn't want to. I said, 'Well, buddy, you are putting me in a bad position with my client, I feel I have earned my commission, you don't have to sell the property, but at this point, I have found you a buyer at the price which we agreed on and I feel you owe the sales commission.'

Q. Did he subsequently refuse to pay any sales commission?

A. Yes, sir."

Jimmy McClung testified that he made an offer, and signed an offer and acceptance form, agreeing to pay $6,000 for some property belonging to Mr. Bennett and shown to him by Mr. Wisdom. On cross-examination Mr. McClung testified that he went to the property with Mr. Wisdom and Mr. Wisdom pointed out five acres.

Mr. Bennett testified that in November Mr. Wisdom contacted him in regard to some land and in this connection he testified as follows:

"A. I told him I had some land on the North side of the road and another parcel of land that I would sell five acres off of and he came down and we got in his car and drove over to this parcel of land and we went to this old school house property, parked his car right at the South corner of the school house property and walked out to the West side of the school house property, just across this acre and I told him I would sell five acres around this school house property.

Q. Was there any talk at that time between you and Mr. Wisdom about what commission he would be paid?

A. No, it wasn't mentioned about the commission. He told me that man would give Six Thousand Dollars, the price of Six Thousand Dollars for the five acres and I told him I would sell five acres around the school house property and showed him and described it to him the best I knew how and showed him where the property was and the corner was.

Q. Was there anything at that time. . . this is on that meeting the first time he came to your house. . . was there anything said be-between you at that time relative to how this Six Thousand Dollars that he mentioned would be paid?

A. No, we didn't discuss it. He said it would be a credit sale or something and I said, 'I don't care, I'd rather sell it and collect the interest anyway,' that is the words I told him.

Q. Was there other conversation between you

at that time, other than what you have testified about, the price or about the specific property?

A. There wasn't anything said about . . . he left and went back and worked out this schedule and come back with this acceptance two or three weeks later.

Q. Did he have anything with him when he brought that offer and acceptance?

A. He was going to sell a strip across, completely across the North line.

Q. How did you know that?

A. He had a little sketch of paper where he had worked out these footages and amount of footage it would take for this acre of ground.

Q. Had there been any drawings or footages shown to you or had you drawn any for him before that time?

A. No, sir."

On cross-examination Mr. Bennett testified as follows:

"Q. Mr. Bennett, you say you did agree to sell five acres around what would be the Northeast corner, is that correct?

A. Yes, sir.

Q. And that is on the North end of your property, isn't that true?

A. Northeast corner of the property.

Q. But five acres would include a strip across the North line?

A. No, sir.

Q. Did you not point out the particular points that would mark the boundaries for this property you wanted to sell?

A. Yes, sir. * * * [T]he property is still for sale and to sell a five acre block around the school house property can still be bought, but I can't close my road up on the North end when I finish my road. I would have a dead end street on all my property from the South which would be approximately ten or eleven lots on each side of this road that I am building. I would have a dead end street when I get to this strip he was talking about, a five acre strip across the back.

Q. But you did point out to Mr. Wisdom the area you wanted sold around the Northeast corner?

A. Yes, sir, and he came back with a strip across the property, across my road, my proposed road, and I said, 'I can't go like that.'"

The fact that Wisdom is a licensed realtor vests him with no benefits in this case outside the affirmative provisions of his contract with Bennett. Perhaps such contract should be within the statute of frauds but it is not. *Dallas* v. *Moseley,* 150 Ark. 210, 233 S. W. 1084; *Blanton* v. *Jonesboro B. & L. Association,* 176 Ark. 315, 3 S. W. 2d 964. So long as a realtor's right to a commission may rest in oral contract, such contract may be proved by oral testimony; and so long as a contract may be proven by oral testimony, trial courts and juries must resolve conflicts in such testimony.

710

Had we been trying this case in the first instance, we are unable from the cold record alone to say whether we would have decided the issues in favor of Bennett or in favor of Wisdom as the trial court did. However, as the matter now stands, on appeal in this court, we are only concerned with whether there was any substantial evidence to sustain the judgment of the trial court, and we conclude that there was.

The judgment is affirmed.