J. T. WILLIAMS *v.* CARL LEE
d/b/a CARL LEE AGENCY

5-6200                                      493 S.W. 2d 122

Opinion delivered April 23, 1973

*R. H. Mills,* for appellant.

*Eugene Coffelt,* for appellee.

J. FRED JONES, Justice. Carl W. Lee filed suit in chancery court against Harold Bryan and his wife and J. T. Williams and his son, Floyd, for $6000 in real estate brokerage commission. The case was transferred to circuit court where a jury was waived and a trial before the court resulted in judgments against Bryan for $3,000 and against J. T. Williams for $3,000. Only Williams has appealed.

Lee is a licensed real estate broker engaged in the real estate and insurance business in Benton County, Arkansas. The appellant Williams owned real estate in Seadrift, Texas, and advertised it for sale or trade in a Benton County newspaper. Mr. Lee saw the advertisement, got in touch with Mr. Williams by phone and Williams came to Benton County to look at property Lee had listed for sale. Lee took Williams to see some land belonging to a Mr. J. T. Smith in southern Missouri, and took him to see a farm in Benton County belonging to Harold Bryan and his wife. Williams was not interested in trading for the Smith property in Missouri but did become interested in trading for the Bryan farm. Bryan went with Williams to Texas and inspected Williams' Seadrift property. Mr. and Mrs. Bryan then went with Williams to Williams' attorney in Fort Smith and had a sales agreement drawn and deeds prepared for the exchange of their properties. No cash was involved in the transaction. The agreement signed by Mr. and Mrs. Bryan and Mr. and Mrs. Williams was notarized in Fort Smith on May 27, 1971. The deed from Mr. and Mrs. Bryan was made to Teddy Floyd Williams, the son of appellant J. T. Williams, and notarized by Mr. Max Cooper, a practicing attorney and notary public in Rogers, Arkansas, on July 10, 1971.

When Mr. Lee learned that the deed from the Bryans to Williams had been filed for record, he filed his complaint alleging that the Bryans had listed their property with him for sale or trade; that he had caused Williams to become interested in the purchase of the property, and that as a result of Lee's services Mr. and Mrs. Bryan executed their warranty deed to Teddy Floyd Williams conveying the property to him on July 10, 1971. He alleged that J. T. Williams was the real purchaser

and the conveyance to Teddy Floyd Williams was executed with the willful and deliberate intention of deceiving and defrauding him out of his real estate commission. He alleged that prior to July 10, 1971, Harold Bryan and J. T. Williams agreed to pay him the sum of $3,000 each as a real estate commission. He alleged that as a result of the deceit, fraud and conspiracy practiced by the defendants, he was entitled to a judgment against them in the sum of $6,000. Mr. and Mrs. Bryan, as well as J. T. Williams, filed their answers denying the allegations in Lee's complaint. On his appeal to this court Williams has designated the points he relies on for reversal as follows:

> "The Court's finding that Appellee was not a volunteer is against the weight and preponderance of the evidence and constitutes reversible error.
>
> The Court's finding that the acceptance of the services of a real estate broker, knowing he was a broker, entitles such broker to a real estate commission, is against the law and evidence and constitutes reversible error.
>
> The Court's reliance upon custom and usage in determining the question of fact as to the existence of an agreement for a real estate commission is against the law and the evidence and constitutes reversible error.
>
> The Court committed prejudicial error in refusing to let Richard Hurd testify."

We find it unnecessary to devote much time to the separate discussion of the points because as we interpret the trial court's findings, the judgment was based on a finding that Williams *agreed to pay* one-half of the real estate commission in the amount of $3,000, and if there is any substantial evidence to sustain this finding, we must affirm. *Courtney* v. *G. A. Linaker Co.,* 173 Ark. 777, 293 S. W. 723. See also *Vanemburg* v. *Duffey,* 177 Ark. 663, 7 S. W. 2d 336.

Mr. Lee testified that the Bryans listed their property with him for sale or trade at a list price of $110,000. This was admitted by Bryan and was not denied by Williams. Lee said the listing was an "open listing" as most of his listings are, and that an "open listing" simply means a "verbal listing." Much of the testimony in this case, however, was directed toward evidence of a "verbal listing" by Mr. Williams of his Texas property for sale or trade by Mr. Lee, and Mr. Lee's right to dual commissions on the exchange of the properties between Williams and Bryan. Mr. Lee did not allege, or even suggest, such listing in his complaint. In the trial court's findings he did comment on portions of the large body of law pertaining to real estate commissions under such circumstances, but the judgment against Williams was based on his separate agreement to pay $3,000 as one-half of Lee's commission, all of which could have been charged to or collected from Bryan. We do not agree with Mr. Lee's statement that an "open listing" simply means a "verbal listing." See *Miller* v. *Jones*, 54 Tenn. App. 31, 387 S. W. 2d 627. What we said in *Bennett* v. *Wisdom*, 248 Ark. 702, 453 S. W. 2d 396, is applicable to the situation in the case at bar. In *Bennett* we said:

> "The fact that Wisdom is a licensed realtor vests him with no benefits in this case outside the affirmative provisions of his contract with Bennett. Perhaps such contract should be within the statute of frauds but it is not. *Dallas* v. *Mosely,* 150 Ark. 210, 233 S. W. 1084; *Blanton* v. *Jonesboro B & L Association,* 176 Ark. 315, 3 S. W. 2d 964. So long as a realtor's right to a commission may rest in oral contract, such contract may be proved by oral testimony; and so long as a contract may be proven by oral testimony, trial courts and juries must resolve conflicts in such testimony."

We deem it unnecessary to set out the testimony in detail. We have carefully reviewed the entire record and there is no question that Lee had a verbal contract or listing to sell or trade the Bryan property. Both Lee and Williams admit and recognize such agency. There is no question that Lee showed the Bryan property to Williams and that Williams was immediately interested in trading.

As a matter of fact both Bryan and Williams seem to admit that Lee has earned a real estate commission on the transaction and the amount of it is not questioned. Williams contends that Bryan should pay it and Bryan contends that Williams should pay half. Lee and Bryan testified that Williams agreed to pay one-half of the commission but Williams denied he ever agreed to pay any of the commission. Mr. Lee said he first took Williams to look at the Smith property he had listed in Missouri and then showed Williams the Bryan farm. He said that after he showed Williams the Bryan farm they returned to the Bryan driveway and that Mr. Bryan was in the pickup truck with him and Williams. He then testified as follows:

> "Q. Now, did you have a deal closed at that time? Did you have a firm agreement that there was going to be a sale between these people or trade?
>
> A. We had an agreement, Mr. Williams agreed to trade right there in the pickup truck and then that was when we got down to the commission part and each one agreed to pay me three thousand dollars a piece."

Mr. Lee testified that under his agreement with Bryan his commission would have been $7,200 at 6% but that in the event of a trade he agreed to reduce his commission to $6,000.

> Mr. Bryan testified in part as follows:
>
> "Q. Was there—did Carl Lee make any statement there in your presence and J. T. Williams' presence in regard to a real estate commission? And if so, what amount it was?
>
> A. My place was listed at one hundred ten thousand dollars and J. T. Williams had his place, at that time, at a value of approximately one hundred fifty thousand dollars evaluation. Carl Lee rounded out the figure at one hundred thousand dollars and figured a commission on that on a trade, which

would be six thousand dollars. Each one paying three thousand dollars. And I made the statement then I will do whatever is right.

Q. What did J. T. Williams say?

A. I don't recollect what J. T. Williams said."

Mr. Bryan said that after he entered into the contract with Mr. Williams at the attorney's office in Fort Smith, he took his listings out of the newspaper and didn't want Mr. Lee to know he had traded with Williams. He said that Williams had convinced him that Lee was not entitled to a commission. He testified that when he went to Max Cooper's office to sign the deed, his wife was worried that Mr. Lee might later claim his commission and she did not want any kind of lawsuit. He said Williams agreed at that time that if they were sued and had to pay a commission, he would pay one-half of it. He then testified that he and Williams went to see a Mr. Hurd with the idea of transferring title to the farm to Mr. Hurd, who would in turn transfer it back to Williams "after everything cooled off." He said the property was not transferred to Hurd but that Mr. Williams kept coming back with different ideas and finally said to put the title in Teddy Floyd's name. He said that up to a point, he tried the best he could to avoid paying a commission to Mr. Lee, but that in order to clear up his integrity and character, he now desires to pay him. He said he was not thinking about his integrity and character at the time he was dealing with Williams but that his wife was.

Mr. Cooper testified that Williams made the appointment to have the Bryan deed acknowledged; that he recalls Mrs. Bryan being upset about the possibility of litigation over the realtor's commission but he does not recall what was said. Mr. Hurd was called as a witness by Williams. He was not permitted to testify as to conversations between Bryan and Williams out of the presence of Lee. He did testify that he was acquainted with Bryan and Williams; that they came to see him and that he had never known or seen Bryan prior to that one time. Bryan

said it was Williams' idea to deed the property to Hurd until things "cooled off" and Williams said that it was Bryan's idea. Mrs. Bryan did not testify.

Mr. Williams testified that Mr. Lee called him in regard to the advertisement he had placed in the Rogers newspaper and that he told Mr. Lee he was interested in trading for a farm. He said he wanted a farm in Benton County where his other farmland was located, but that Mr. Lee first showed him some land in Missouri and there was nothing at all mentioned about a realtor's commission. He said that Mr. Lee next showed him a rooming house which he had listed and then showed him the Bryan farm. He said after looking at the corners of the Bryan land they drove back to the Bryans' house and that Mr. Bryan was in Lee's pickup truck with them most of the time at the Bryan farm. He said he heard Mr. Lee say something to Mr. Bryan about a commission, "he told Harold he would have to pay something. I don't hear too well, but I believe he said that." Mr. Williams denied that he ever did discuss paying Mr. Lee a commission. He said he told Mr. Bryan and Mr. Lee he was interested in the property but would have to talk with his son before making a firm offer to trade. He said he took Mr. Bryan to Texas to inspect the Seadrift property and after returning from Texas, he and Mr. Bryan went to Fort Smith and had his attorney draw up an agreement on the exchange of properties. He said on July 10, which was a Saturday, Mr. and Mrs. Bryan came to his home; that Mrs. Bryan was upset and wanted to know what to tell people, whether they had a trade or not. He said that under their agreement the Bryan deed was not to be made until later but Mrs. Bryan wanted to get the deal over with. He said he then called Mr. Cooper who agreed to meet them at his office so they went to Max Cooper's office where Mr. and Mrs. Bryan executed their deed. He then testified as follows:

"Q. Was there any conversation at that time about a commission owed to Carl Lee?

A. Uh, yes, Mrs. Bryan was very upset about the commission all the way through and she made the

statement there to Mr. Cooper and then she said, we'll just go ahead and get this over and go by and take care of that with Mr. Carl Lee.

Q. All right, did you at that time make any agreement to pay a commission?

A. I did not."

Mr. Williams denied that he was insisting that the Bryans close the deal and on this point he testified on cross-examination as follows:

"Q. Okay, in other words, Bryan was insisting on the deed being made, is that correct?

A. Mr. Coffelt, ever since this come up, Mrs. Lee, pardon me, Mrs. Bryan was very upset and they come to our house and they wanted to back out of the deal. And we told them we would back plumb out, and we give 'em, they said then, we sat and talked a while, and they wanted to wait until Wednesday to make up their minds. And we waited until Wednesday and then we went down there and they said they made up their minds to go ahead through with the deal. Now, that's the truth of the whole thing."

Mr. Williams said that Mrs. Bryan was considerably upset all along; that she talked about paying Carl Lee and tried to get Mr. Bryan to go pay Mr. Lee. He said that Bryan left and then came back and said that Mr. Lee had agreed to take a cow and calf for his commission.

Mr. J. T. Smith testified that he had some property in Missouri listed with Mr. Lee for sale or trade, and Mr. Lee brought Mr. Williams to look at the property. He said that Lee told him and Williams that if they traded properties, the real estate commission would be equally shared by them. He said that Mr. Williams was present and heard the statement made by Mr. Lee, but that he does not know what Mr. Williams' response was. He then concluded his testimony as follows:

"A. Well, he told us that we would share the commission.

Q. But you didn't know anything about what the agreement he and Mr. Williams actually had, did you, about the listing of the property in Texas?

A. No, not a thing.

Q. And you said when he told you that the commission would be shared that you don't remember what Mr. Williams' response was, do you?

A. No."

On rebuttal Mr. Bryan denied that he called Mr. Williams and insisted that they execute the deed and get the transaction out of the way.

The proffered testimony of Hurd had he been permitted to testify was to the effect that Bryan approached him about taking title to the property. Bryan denied that he suggested the conveyance to Mr. Hurd in order to beat the real estate commission. He admitted that he and Williams went to see Mr. Hurd about taking title to the property. He said, however, that he had never met Mr. Hurd and that it was Mr. Williams who asked Hurd about taking title to the property to avoid payment of realtor's commission.

Hurd's testimony would have been admissible had the proper foundation been laid, but it would only have gone to the credibility of the testimony of Bryan and Williams as to which one suggested temporary title in Hurd and the reason therefor. There is little question that both Bryan and Williams went to considerable length in avoiding the payment of a commission to Lee.

The evidence clearly indicates that Williams was anxious to trade properties as soon as he saw the Bryan property. The evidence also clearly indicates that Mrs. Bryan was upset about the entire transaction and especially about the possibility of having to pay a commission on the trade. Williams first said that when the Bryans came to his home on July 10, Mrs. Bryan was upset because she was unable to tell people whether there had

been a trade or not and the Bryans wanted to get the transaction over with. On cross-examination he said the Bryans were wanting to back out of the deal and wanted to wait until Wednesday before executing their deed. The trial court might well have reasoned that in order to save the deal Williams did offer, in Max Cooper's office, to pay one-half the commission as Bryan testified he did. This evidence would tend to corroborate Lee's testimony that Williams promised to pay one-half of the commission in the amount of $3,000 if the trade was consummated. In any event, the trial court correctly found from a preponderance of the evidence, that Mr. Lee was not a volunteer in bringing the parties together and that Mr. Williams as well as Mr. Bryan knew that Mr. Lee would expect to charge a commission on the trade made between them. The attorneys argued the law on evidence as to dual agency and commissions as well as to a real estate agent's status as a volunteer. The trial court reviewed some of the law as related to the various arguments made by the attorneys but as we interpret the record, the trial court rendered the judgment on findings as follows:

> ". . . considering all the circumstances and the later action by the defendant indicates to me that the defendant knew that he would expect a commission. And this indicates to me that the commission was, as has been testified, discussed as being split, because here is something else that this court knows and every other court knows; and that is, that it is an almost inflexible rule in real estate trades in this area that where there is a trade of equity for equity or property for property, and no cash or hard money changes hands, that each party pays presumably half or at least a part of the brokerage fee depending on the relative value of the property in trade. And in this case the testimony was that there was an agreement as to a fifty-fifty split, and it's reasonable. I have no other way to decide the fact questions on whether there was an agreement as to commission or not. When one side says there was, and the other side says no there wasn't except on what is reasonable under the circumstances. And what probably took place because of the circumstances that have been re-

lated in evidence and on that basis I find that there was such an agreement. And that the commission was owed because the parties interfered and prevented the broker from completing the transaction."

Certainly such mere announcement by Mr. Lee, as testified by Mr. Smith, that if the parties trade properties the real estate commission will be equally shared by them, does not create a binding contract for the payment of commission. Neither does custom and usage alone create binding contracts. As we interpret the above finding, the trial court did not rely upon custom and usage in determining the question of fact as to the existence of an agreement for a real estate commission. As we interpret the trial court's findings, he based his findings on evidence that Williams agreed to pay one-half of the real estate commission to Lee in the amount of $3,000 and in the light of the circumstances, including local custom, he did not find the testimony that Williams did agree to pay one-half of the commission to be unreasonable. We conclude that the judgment must be affirmed.

Judgment affirmed.

HARRIS, C.J., and FOGLEMAN, J., dissent.

JOHN A. FOGLEMAN, Justice, dissenting. I dissent because it seems obvious to me that the trial court took into consideration local custom and usage as a circumstance in determining where the preponderance of the evidence lay on the question whether there was an agreement on the part of appellant to pay a real estate commission.

I am authorized to state that the Chief Justice joins in this dissent.